IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-01215-WYD-KLM

GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, a New York Mutual Life
Insurance Corporation,

    Plaintiff/Counterclaim Defendant,

v.

SUSAN WILDS, an individual,

    Defendant/Counterclaimant.

_____

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

This matter is before the Court on the **Amended Motion to Enforce Attorneys'**

**Lien** [#56][1] (the "Motion"), filed by Defendant/Counterclaimant's former counsel, Donald F.

D'Antuono ("D'Antuono") and Douglas A. Turner ("Turner" and collectively with D'Antunon,

"Movants"). Defendant/Counterclaimant Susan Wilds ("Wilds") filed a Response [#60] and

Movants filed a Reply [#61]. Pursuant to 28 U.S.C. § 636(b) and D.C.COLO.LCivR 72.1(c),

the Motion has been referred to this Court for a recommendation regarding disposition

[#58].[2] The Court has reviewed the Motion, the Response, the Reply, the entire docket,

---

[1] "[#56]" is an example of the convention I use to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). I use this convention throughout this Recommendation.

[2] A motion concerning post-judgment attorney fees is a dispositive motion which requires a recommendation from the Magistrate Judge. *Deitz v. University of Denver*, No. 95-cv-02756-WDM-OES, 2011 WL 723118, at *7 (D. Colo. Feb. 22, 2011). Here, Movants seek to enforce an attorney lien relating to pre-judgment attorney fees. However, a determination of such fees would be dispositive of Movants' claim and would directly impact Defendant's recovery. Accordingly, the undersigned assumes that the Motion is dispositive and requires a recommendation. *See Oil Corp.*

and the applicable law, and is sufficiently advised in the premises.  For the reasons set forth below, the Court respectfully **RECOMMENDS** that the Motion [#56] be **GRANTED in part** as described below.

## I. Background

This is a declaratory judgment action brought by Guardian Life Insurance Company of America ("Guardian") relating to coverage pursuant to a life insurance policy.  On January 31, 2013, Guardian filed its Motion for Interpleader [#26] pursuant to Fed. R. Civ. P. 22 which was granted on September 27, 2013.  *Order* [#42] at 7.  As a result, Guardian deposited $336,634.93 into the Court's Registry.  *Status Report* [#48] at 1.  On November 19, 2013, the Court dismissed with prejudice Guardian's declaratory judgment claim, the sole claim asserted in the Complaint [#1].  *Minute Order* [#57] at 1.

On January 28, 2013, Movants filed a Notice of Lien for Attorney's Fees [#25] (the "Notice").  In the Notice, Movants state that they are entitled to "33 1/3% of the $325,000.00 life insurance proceeds offered by [Guardian] . . ., together with [ ] 33 1/3% of the offer to pay statutory interest to date."  *Notice* [#25] at 1.  Movants base this claim on an "executed contingent fee agreement" allegedly entered into by them and Wilds.  *Id.*  Movants did not attach the contingent fee agreement or any other documents to the Notice to substantiate their allegation that Wilds agreed that they are entitled to one-third of the life insurance proceeds plus interest.

On May 23, 2014, Movants filed their Corrected Motion for Enforcement of Charging Lien for Attorneys' Fees [#35] (the "First Motion"), which the Court recommended be denied

---

*v. Sparrow Indus.*, 847 F.2d 1461, 1462-63 (10th Cir. 1988) (a magistrate judge may issue orders on nondispositive motions only).

without prejudice because Movants failed to provide any "evidence to substantiate their claim of the existence of a contingent fee agreement or the reasonableness of the amount they [sought]." *Recommendation of United States Magistrate Judge* [#47] (the "Recommendation") at 5.  On November 15, 2014, Movants filed an objection to the Recommendation [#55] and filed the instant Motion [#56].  As a result of the filing of the instant Motion, the Court denied the First Motion as moot and held that the Recommendation was moot. *Minute Order* [#59] at 1.

Movants state "that the substance of [the] Motion will provide sufficient information which was deemed to be lacking by" the Court in the Recommendation.  *Motion* [#56] at 1.  Other than the title of the Motion, Movants do not specifically state what relief they seek in the Motion.  However, based on the title of the Motion and the series of filings by Movants in this case, the Court understands that they seek to enforce an attorney lien and ask the Court to reduce the lien to judgment. *See First Motion* [#35] at 2 (requesting "that this Court enforce the lien perfected by said attorneys"); *Motion* [#56] at 1 (titled "Amended Motion to Enforce Attorneys' Lien").

On July 15, 2014, the Court entered a Minute Order informing Movants that they failed to attached the billing statement discussed in the Affidavit of Douglas A. Turner [#56-3] ("Turner Affidavit"), which was filed in support of the Motion.  The Court ordered Movants to file the billing statement on the docket if they wanted the Court to review the billing statement mentioned in the Turner Affidavit when considering the Motion. *Minute Order* [#62] at 2.  In response, on July 17, 2014, Movants filed a document titled Billing Statement Affidavit [#63] (the "Billing Statement"), which, collectively, includes a second affidavit of Douglas Turner and various billing statements Movants maintain relate to the work

performed regarding their representation of Wilds.  On July 29, 2014, the Court set a deadline for Wilds to respond to the Billing Statement. *Minute Order* [#64] at 1.  The Court informed Wilds that "the Court does not believe that any response to the Billing Statement is necessary," but informed Wilds that if she wanted to file a response to the Billing Statement, such response "shall be filed on or before August 8, 2014." *Id.* (emphasis omitted).  Wilds has not filed a response to the Billing Statement and her deadline to do so has elapsed.

## II. Analysis

Colorado law applies because the Motion seeks to enforce an attorney lien. *Apa v. Qwest Corp.*, 402 F.Supp.2d 1247, 1248 (D. Colo. 2005) (applying state law in case filed in federal court in which plaintiff's attorney withdrew during the pendency of the litigation and filed an attorney lien for costs and expenses incurred while performing work on behalf of plaintiff and stating: "Under the law of this circuit, the law of the state where the case is filed and prosecuted governs the applicability of attorney's liens.") (citing *Donaldson, Hoffman & Goldstein v. Gaudio*, 26 F.2d 333, 335 (10th Cir. 1958)).  Pursuant to Colo. Rev. Stat. § 12-5-119, attorneys "shall have a lien on any money . . . or . . . any judgment they may have obtained or assisted in obtaining, in whole or in part, and on any and all claims and demands in suit for any fees or balance of fees due or to become due from any client.". *See Apa*, 402 F.Supp.2d at 1248 ("Colorado attorneys have a statutory right to an attorney's charging lien.").  Notably, "the charging lien extends only to attorney fees for those professional services rendered in obtaining the judgment and not for unrelated services." *In re Estate of Benney*, 790 P.2d 319, 323 (Colo. 1990).  Further, the lien attaches only "to the extent of the attorney's reasonable fees remaining due and unpaid."

4

*Gold v. Duncan Ostrander & Dingess, P.C.*, 143 P.3d 1192, 1193 (Colo. App. 2006).  In addition, Movants bear the burden of demonstrating the validity of their lien.  *Deitz v. Univ. of Denver*, Nos. 95-cv-02756-WDM-OES, 97-cv-00897-WDM-OES, 2011 WL 723118, at *8 (Feb. 22, 2011) ("it is the claimant who bears the burden of proof); *Bd. of Cnty Comm'rs of Jefferson Cnty v. Quaintance*, 183 P.2d 569, 571 (1947) (citation omitted); *In re Marriage of Mitchell*, 55 P.3d 183, 185 (Colo. App. 2002) ("the burden of proof is upon the attorney who claims a lien for services to show that he or she comes within the statute").  "This lien accrues from the moment an attorney commences services and remains enforceable even if the lawyer subsequently withdraws from the engagement." *United States, ex rel. Maxwell v. Kerr Mc-Gee Oil & Gas Corp.*, No. 04-cv-01224-MSK-CBS, 2010 WL 582393, at *4 (D. Colo. Feb. 17, 2010) (internal quotation marks and citations omitted).  Finally, "strict compliance with the statute is necessary." *In re Marriage of Mitchell*, 55 P.3d at 185.

Pursuant to Colo. Rev. Stat. § 12-5-19, the lien may be perfected by filing a proper notice with the Clerk of the Court where the action is pending.  Colo. Rev. Stat. § 12-5-19. The notice shall set "forth specifically the agreement of compensation between such attorney and his client . . . ." *Id.*  The Notice sets forth that Wild and Movants entered into a written fee agreement which stated that Movants would receive 33 and 1/3 percent of the $325,000.00 recovery offered by Guardian in this case, plus 33 and 1/3 percent of the offer to pay statutory interest.  *Notice* [#25] at 1.

## A.    The Agreement

The Notice did not attach any supporting documents.  However, Movants attached exhibits in support of the instant Motion.  Specifically, Movants attach a document titled Contingent Fee Agreement and Disclosure Statement, dated June 27, 2012.  *Motion, Ex.*

*1* [#56-1] (the "Agreement") at 1, 4.  The Agreement is signed by Wilds and Movants and states that Wilds, defined as "Client" in the Agreement, retains the Movants' law firms to represent her "in connection with the death of her husband Mark Allen and the subsequent denial of life insurance coverage by Guardian Life Insurance Company, which denial of coverage of life insurance proceeds occurred in the year 2012[.]"  *Agreement* [#56-1] at 1. The Agreement includes a section titled "Attorney's Fees" which states:

> In the event that the Client collects any sum of money in connection with the Claim, either through a settlement reached before or after a lawsuit is filed, or through a judgment entered in an arbitration proceeding or trial, the Client agrees to pay the Attorneys a fee equal to thirty-three and one third percent (33 1/3%) of the gross amount collected.  "Gross amount collected" means the amount collected before any subtraction of expenses and disbursements. The attorney's fees shall be deducted directly from the gross amount collected.  In the event the Client does not collect any money in connection with the Claim, the Client owes no fee to the Attorneys for its [sic] services.

*Id*.  Later, after explaining several types of fee arrangements, the Agreement states that "[t]he Client has elected to retain the Attorneys on a contingent-fee basis."  *Id*.  The Agreement also discusses potential expenses the attorneys may incur, estimates potential expenses in the range of $5,000.00 to $15,000.00 for a claim settled prior to trial, and states that the attorneys may incur an additional $10,000.00 in expenses if the claim goes to trial.  *Id*. at 2.  Wild specifically authorized her counsel to incur reasonable expenses on her behalf and was informed that "[a]ny reasonable expenses incurred by the Attorneys shall be deducted directly from the net amount remaining from any sum collected by the Client after deduction of the Attorneys's fees."  *Id*.  However, Wild's counsel agreed to obtain Wild's authority for expenses in excess of $5,000.00.  *Id*.

The Agreement also includes provisions regarding termination of representation by either counsel or the client.  *Id*. at 3-4.  The Agreement states that "[i]n the event the

6

Attorneys withdraw from representing the Client in accordance with this paragraph, the Client shall remain responsible for, and does agree to pay, any expenses advanced by the Attorneys." *Id.* at 4. In addition, the Agreement provides that if Wilds elects to terminate counsel's representation of her without wrongful conduct by counsel or if counsel "justifiably withdraws,"

> [i]f the Attorneys and the Client cannot agree how the Attorneys [are] to be compensated . . ., the Attorneys will request the Court or other tribunal to determine: (1) if the Client has been unfairly or unjustly enriched if the Client does not pay a fee to the Attorneys; and[ ] (2) the amount of the fee owed, taking into account the nature and complexity of the Client's case, the time and skill devoted to the Client's case by the Attorneys, and the benefit obtained by the Client as a result of the Attorneys's efforts. Any such fee shall be payable only out of the gross recovery obtained by or on behalf of the Client and the amount of such fee shall not be greater that the fee that would have been earned by the Attorneys if the contingency described in Paragraph One of this Agreement has occurred.

*Id.* The Agreement further states that if Wilds terminates her counsel for wrongful conduct, Movants would "forfeit any fee." *Id.*

On November 27, 2012, Wild sent an email to her counsel stating that she was "dropping this case (at least with you g[u]ys, due to incompetent representation)." *Motion, Ex. 4* [#56-4] ("Email Correspondence") at 15. Later that day, she sent another email stating that she wanted to pick up the files relating to her case. *Id.* at 16. On December 4, 2012, Wild sent an email to her former counsel stating: "YOUR [sic] BOTH FIRED!!!!!!!!!!!!" *Id.* at 19. Accordingly, the Court concludes that the client terminated the representation as early as November 27, 2012, but no later than December 2, 2012. *See also Affidavit of Donald F. D'Antuono* [#56-2] ("D'Antuono Aff.") ¶ 9 (stating that Wilds "discharged her attorneys" through her December 4, 2012 email); *Affidavit of Douglas A. Turner* [#56-3] ("Turner Aff.") ¶ 22 ("On December 4, 2012, the client sent an email

terminating our services.").

**B.    The Motion**

In the Motion, Movants seek one-third of the amount deposited by Guardian into the Court Registry as a contingent fee pursuant to the Agreement "plus payment of case expenses." *Motion* [#56] at 3.  In the alternative, if the Court finds that they are not entitled to a contingent fee and that Movants are instead entitled to reasonable attorneys' fees, Movants ask the Court to award them $82,36.09 or $94,973.00[3] plus costs.  *Id.*  Movants state that "[r]ecoverable costs in this matter totaled . . . $9,869.19."  *Id.* at 4.  According to the Billing Statement, $6,792.50 relates to Mr. Aisenberg's[4] services and the remaining $3,076.69 relates to other costs incurred by Movants such as expert fees for Mr. Laugeson, Judge Abram's fees for a meeting regarding "continued ethical guidance," postage, and copying costs.  *Billing Statement* [#63] at 2, 3, 17.

In her Response[5], Wilds states that she "fired the attorneys for their wrongful conduct on 12/04/12."  *Response* [#60] at 2.  It is unclear exactly what wrongful conduct allegedly occurred.  However, Wilds states that she felt pressured to accept telephone calls from Mr. D'Antouno on Friday and Saturday nights and described a meeting with her former counsel held in November 2012.  *Id.* at 1.  Regarding the November 2012 meeting, Wilds

---

[3]  The two amounts vary only in the hourly rate applied to Mr. D'Antuono's work.

[4]  Mr. Aisenberg provided an expert opinion in support of the Motion, detailing the proper hourly rate for Movants and their staff and discussing the complexity of the case, among other things.  *See generally opinion letter of Bennett S. Aisenberg* [#56-5] (the "Aisenberg Opinion").

[5]  The Court notes that the Response was filed on April 16, 2014, outside of the time limit prescribed by D.C.COLO.LCivR 7.1(d).  However, because Wilds is proceeding pro se and "[a] pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers," *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991), the Court addresses the Response and considers the arguments advanced by Wilds.

states that counsel advised her that she "could not receive . . . funds from Guardian Life unless [she] revealed the information in the files of [her] deceased husband's business." *Id*. She also states that "Doug Turner was asking for my deceased husband's client transaction paperwork that was due to take place in the near future." *Id*. Wilds maintains that she refused to turn over the information and that "[n]one of us ever had another civil conversation." *Id*. at 2. She further argues that

> [b]ecause [she] terminated the attorneys for wrongful conduct, they are not entitled to any fees pursuant to section 12 of the fee agreement. Even if it were deemed that they "withdrew" due to disagreement over prosecution of the case, they should be limited by section 11 of the fee agreement to any justifiable expenses advanced. What they are looking for is unreasonable.

*Id*.

In their Reply, Movants maintain that the Email Correspondence makes clear that Guardian was willing to pay the face amount of the life insurance policy at issue but that Movants "could make no reasonable approach to Susan Wilds in writing for the purpose of discussing any matter for any purpose." *Reply* [#61] at 2. With regard to Wilds' contention that she fired Movants due to wrongful conduct, Movants argue that she does not specify what the alleged wrongful conduct was and attaches an email from Wilds to Guardian's counsel in which Wilds states: "I would pay those guys on an hourly basis for whatever work they 'claim' they have done out of **courtesy**." *Reply, Ex. 2* [61-2] at 2 (emphasis in original). Movants then argue that this contradicts Wilds' current position that they should receive no compensation. *Reply* [#61] at 3.

## C.    The Lien

There is no dispute that the parties entered into the Agreement. Further, the parties

do not dispute that Movants performed work on behalf of Wilds to assist her in receiving money from Guardian under a life insurance policy.  In addition, the Email Correspondence supports Movants' position that the work they performed on Wilds' behalf resulted in Guardian deciding to pay the full value of the policy.   *Motion* [#56] at 3; *Email Correspondence* [#56-4] at 8-9 (November 7, 2012 email from Mr. D'Antuono to Ms. Wilds informing her that if certain issues were resolved Guardian's counsel would recommend that Guardian pay the full value of the life insurance policy), 13-14 (November 26, 2012 email from Mr. D'Antuono to Ms. Wilds discussing same).   In addition, Movants offer information about their representation of Wilds to substantiate the difficulties Wilds faced in recovering from Guardian.  *See D'Antuono Aff.* [#56-2] ¶ 4; *Turner Aff.* [#56-3] ¶¶ 11-19; *Aisenberg Opinion* [#56-5] at 2-3.  These included issues such as: (1) the beneficiary on the life insurance policy was identified as "Susan Havice," not Susan Wilds, *Turner Aff.* [#56-3] ¶ 13; (2) on the death certificate, the decedent was listed as single, not married, *id.* ¶ 14; (3) the death certificate noted that the cause of death was "multiple drug intoxication" but did not provide any information on the line noting "[d]ue to or as a consequence of," *id.*; and (4) there was a lack of financial information about the decedent when Guardian initially denied the claim, *id.* ¶¶ 15-18; *compare Complaint For Declaratory Relief* [#1] at 1 ("[I]t seems that Mr. Allen [the decedent] made certain material misrepresentations in the application for the life insurance policy.") *with Plaintiff's Motion For Interpleader* [#26] at 3 ("Having now obtained at least some of the information that Guardian had been asking Ms. Wilds to produce, Guardian now seeks to interplead the policy benefits into the court registry for distribution in accordance with an appropriate order of this Court.").

The disagreements are two-fold: whether Wilds terminated the representation for

cause and, if she did not, how much Movants are entitled to recover in attorneys' fees.

On November 27, 2012, Wilds sent an email to her counsel stating that she was "dropping this case (at least with you g[u]ys, due to incompetent representation)." *Email Correspondence* [#56-4] at 15. On December 4, 2012, Wilds sent an email to her former counsel stating: "YOUR [sic] BOTH FIRED!!!!!!!!!!!!!" that did not provide information regarding any wrongful conduct on the part of Movants. *Id.* at 19. However, in her Response, Wilds states that she "fired the attorneys for their wrongful conduct on 12/04/12." *Response* [#60] at 2. Wilds states that she felt pressured to accept telephone calls from Mr. D'Antuono on Friday and Saturday nights and took issue with advice she received from Movants at a November 2012 meeting. *Id.* at 1. She also states that "Doug Turner was asking for my deceased husband's client transaction paperwork that was due to take place in the near future." *Id.* at 2.

Because the Agreement does not define "wrongful conduct," and the contemporaneous correspondence between the parties does not state that Wilds terminated the relationship for wrongful conduct, nor does the correspondence indicate that any criminal or overtly wrongful conduct occurred, the Court examines legal precedent regarding wrongful conduct by attorneys to determine whether the conduct alleged was wrongful. In Colorado, a client who suffers damages due to attorney negligence may bring a legal malpractice claim. *DerKevorkian v. Liobridge Techs., Inc.*, No. 04-cv-01160-LTB-CBS, 2006 WL 197320, at *12 (D. Colo. Jan. 26, 2006). "To sustain an attorney malpractice claim founded on negligence, a plaintiff must establish that: 1) the attorney owed a duty of care to the plaintiff; 2) the attorney breached that duty; and 3) the breach proximately caused damage to the plaintiff." *Id.* (citing *Giron v. Koktavy*, 124 P.3d 821, 824

(Colo. App. 2005)); *Stone v. Satriana*, 41 P.3d 705, 712 (Colo. 2002) (finding that attorney's conduct did not fall below the standard of care).  Here, there is no allegation of specific wrongful conduct by Movants that led to their termination and the conduct Wilds does allege about her interactions with them does not amount to wrongful conduct.  *Cf. Hopp & Flesch, LLC v. Backstreet*, 123 P.3d 1176, 1183 (Colo. 2005) (analyzing professional negligence claim); *Stone*, 41 P.3d at 712-14 (discussing standard of care for attorneys).  In addition, there is no allegation that the alleged conduct resulted in any damages.  Further, it is not apparent from the correspondence between the parties or the filings in this case that Movants violated the rules of professional conduct.  *Cf. People v. Essay*, 35 P.3d 590, 592 (Colo. O.P.D.J. 2001) (discussing disbarment of attorney who violated many Rules of Professional Conduct including lack of competent representation, fraud, misrepresentation, and dishonesty); *People v. Grossenbach*, 803 P.3d 961, 963 (Colo. 1991) (suspending attorney who repeatedly misrepresented facts to client, did not inform client of critical developments in the case, and failed to file claim in bankruptcy proceeding to protect client's interest).  Therefore, the Court concludes that Wilds did not terminate the representation for wrongful conduct as she alleges in her Response.  *Response* [#60] at 2.  Accordingly, the Court must next determine the proper amount of fees and costs for the lien Movants seek to enforce.

Here, the Agreement provides that "[i]n the event the Attorneys withdraw from representing the Client in accordance with this paragraph, the Client shall remain responsible for, and does agree to pay, any expenses advanced by the Attorneys."  *Agreement* [#56-1] at 4.  In addition, the Agreement provides that if Wilds elects to terminate counsel's representation of her without wrongful conduct by counsel and

12

the Attorneys and the Client cannot agree how the Attorneys [are] to be compensated . . ., the Attorneys will request the Court or other tribunal to determine: (1) if the Client has been unfairly or unjustly enriched if the Client does not pay a fee to the Attorneys; and[ ] (2) the amount of the fee owed, taking into account the nature and complexity of the Client's case, the time and skill devoted to the Client's case by the Attorneys, and the benefit obtained by the Client as a result of the Attorneys's efforts.  Any such fee shall be payable only out of the gross recovery obtained by or on behalf of the Client and the amount of such fee shall not be greater that the fee that would have been earned by the Attorneys if the contingency described in Paragraph One of this Agreement has occurred.

*Id*.  This clause anticipates that the Court will determine the amount of fees based on the work performed by Movants, not on the contingent fee agreed to by the parties.  Further, although not expressly stated in the statute, Colorado law superimposes a reasonableness standard requiring that attorney lien claims be limited to "reasonable fees and expenses." *Deitz*, 2011 WL 2559829, at *6 (applying reasonableness analysis to contingent fee agreement with certain defendants and stating "mere agreement does not make the fee charges reasonable"); *Apa*, 402 F.Supp.2d at 1250; *In re Marriage of Shapard*, 2004 WL 2128802 (Colo. App. 2004); *People ex rel McFarlane*, 581 P.2d at 42 (holding statute "gives the attorney a lien on the judgment to the extent of his reasonable fees . . ."); *cf. Jane L. v. Bangerter*, 61 F.3d 1505, 1510 (10th Cir. 1995) (holding a party seeking an award of attorney's fees must establish the reasonableness of each dollar and each hour for which the party seeks an award).  Therefore, the lien claim is limited to a reasonable amount even if the parties agreed to a larger amount.  *See AIG Annuity Ins. Co. v. Law Offices of Theodore Coates*, P.C., 478 F. App'x 484, 486 (10th Cir. April 16, 2012) (unpublished decision) (affirming district court determination that attorney charging lien was limited to the reasonable fees related to the work performed for the client); *Deitz*, 2011 WL 2559829, at *6; *People ex rel McFarlane*, 581 P.2d 716, 718 (1978) (holding statute "gives the attorney

a lien on the judgment to the extent of his reasonable fees, remaining due and unpaid, for professional services rendered in obtaining the judgment").

Reasonableness may be determined by consideration of the factors listed in Rule 1.5 of the Colorado Rules of Professional Conduct. *See Law Offices of J.E. Losavio, Jr. v. Law Firm of Michael W. McDivitt, P.C.*, 865 P.2d 934, 936 (Colo. App. 1993).[6]  This determination is a question of fact for the Court. *Madison Capital Co. LLC v. Star Aquisition VIII*, 214 P.3d 557, 560 (Colo. App. 2009).  A reasonable attorney fee may also be established by calculating the lodestar amount which represents the number of hours reasonably expended multiplied by a reasonable hourly rate. *Dubray v. Intertribal Bison Coop.*, 192 P.3d 604, 608 (Colo. App. 2008); *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (defining the lodestar amount as the "number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.").  Assuming the reasonableness of the hours and rate, the lodestar amount creates a strong presumption of reasonableness. *Spensieri v. Farmers Alliance Mut. Ins. Co.*, 804 P.2d 268, 270 (Colo. App. 1990); *Homeward Bound, Inc. v. Hissom Mem'l Ctr.*, 963 F.2d 1352, 1355 (10th Cir. 1992) (recognizing the lodestar amount as presumptively reasonable).  Further, the Tenth Circuit has made clear that to determine a reasonable fee request, the Court should begin by calculating the "lodestar amount." *Robinson v. City of Edmond*, 160 F.3d 1275, 1281 (10th

---

[6]  The factors outlined in *Losavio* are: "(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent." *Losovio*, 8665 P.2d at 936 (citing the Colorado Rules of Professional Conduct Rule 1.5).

Cir. 1998). Accordingly, the Court will determine the lodestar amount in this case.

###### 1.   Hourly Rate

A "reasonable rate" is defined as the prevailing market rate in the relevant community for an attorney of similar experience. *Missouri v. Jenkins*, 491 U.S. 274, 286 (1989); *Guides, Ltd. v. Yarmouth Grp. Prop. Mgmt., Inc.*, 295 F.3d 1065, 1078 (10th Cir. 2002); *Malloy v. Monahan*, 73 F.3d 1012, 1018 (10th Cir. 1996). The party requesting fees bears "the burden of showing that the requested rates are in line with those prevailing in the community." *Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186, 1203 (10th Cir. 1998). In order to satisfy this burden, Movants must produce "satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984).

In support of the Motion, Movants submit: (1) the D'Antuono Affidavit [#56-2], (2) the Turner Affidavit [#56-3], (3) Aisenberg Opinion [#56-5], and (4) Bennett R. Aisenberg's Expert Witness Report [#56-6]. Regarding Mr. D'Antuono, he states that he "has been licensed to practice law in the State of Colorado since 1978 and has been a member of the Bar of the United States District Court for the District of Colorado since approximately 1978." *D'Antuono Aff.* [#56-2] ¶ 1. Mr. D'Antuono explains that he has worked on "multiple cases involving denial of coverage [and] achieved settlements in large monetary amounts." *Id.* ¶ 2. Mr. Aisenberg was retained by Movants to provide an "opinion as to what a reasonable attorney's fee should be for [their] representation of Susan Wilds" in this case. *Aisenberg Opinion* [#56-5] at 1. Mr. Aisenberg opines that Mr. D'Antuono "has had significant trial experience in both federal and state courts and has 35 years of practice."

15

*Id.* at 10.  Relying on a survey generated by the Colorado Bar Association in 2008 (the "Survey")[7], Mr. Aisenberg states that he believes Mr. D'Antuono should be included in the 75th percentile, which based on a variety of factors provides a hourly rate of $250-325.  *Id.* at 7.  If the Court were to, instead, place Mr. D'Antuono in the 50th percentile, Mr. Aisenberg states that the hourly rate would be $225-250.  *Id.* at 8.  Mr. Aisenberg further maintains that the Survey provides for a yearly 3% inflation factor.  *Id.*

With regard to Mr. Turner, the information provided explains that he is a non-practicing CPA who has "practiced law in Colorado continuously since 1993."  *Turner Aff.* [#56-3] ¶ 2.  He focuses on "probates, estates, real estate, decedents and litigation in those areas."  *Id.*  Further, he works in tandem with Mr. D'Antuono on certain cases because of his 35 years of trial experience and their complimentary styles.  *Id.* ¶ 3.  Accordingly to Mr. Aisenberg, based on Mr. Turner's experience, the complexity of the case, and other factors, a proper hourly rate for Mr. Turner would also be a rate within the 75th percentile found in the Survey.  Based on specific factors applicable to Mr. Turner, this leads to an hourly rate of $250-295.  *Aisenberg Opinion* [#56-5] at 7.  Mr. Aisenberg explains that, if the Court determines that Mr. Turner's billable rate should be more in line with the 50th percentile of the Survey, a proper hourly rate would be $225-235.  *Id.* at 8.

Movants also seek payment for time spent by Conrad Miller, an attorney who "specializes in tax planning, estate planning, real estate and civil litigation" who has more than 25 year of experience.  *Id.* at 10.  Mr. Turner states that Mr. Miller's standard hourly

---

[7]  *See Universal Drilling Co., Inc. v. Newpark Drilling Fluids, LLC*, No. 08-cv-02686-MSK-CBS, 2011 WL 715961, at *2 (D. Colo. Feb. 22, 2011) (relying on Colorado Bar Association survey when determining reasonable billing rate for Denver attorneys).

16

rate is $235-255.  *Turner Aff.* ¶ 4.  Mr. Miller's fees relate to 3.3 hours of work, the bulk of which was spent meeting with Wilds or reviewing income information provided by Wilds. *Billing Statement* [#63] at 19-20.  Mr. Aisenberg opines that Mr. Miller's hourly rate should be within the 75th percentile of the Survey, which results in an hourly rate of $250-295. *Aisenberg Opinion* [#56-5] at 7.  If, however, the Court determines Mr. Miller's rate should be in the 50th percentile, the rate would be $215-235.  *Id.* at 8.

Movants also include work performed by their office staff in the attorney fee amount they request.  Mr. Turner states that Deborah Jackson is a legal assistant with more than three years of experience and her regular hourly rate is $95.  *Turner Aff.* [#56-3] ¶ 4. Based on her experience. Mr. Aisenberg states that a reasonable hourly rate for Ms. Jackson is $90. *Aisenberg Opinion* [#56-5] at 7.  Mr. Turner explains that Cathy Carver has worked as a legal assistant for more than 12 years and her regular hourly rate is $95. *Turner Aff.* [#56-3] ¶ 4.  Mr. Aisenberg opines that a reasonable hourly rate for her is $100. *Aisenberg Opinion* [#56-5] at 7.

Notably, Wilds does not challenge the hourly rates proposed by Movants.  Based on the information provided by the parties and the undersigned's experience both as a practitioner and on the bench, the Court finds that the following hourly rates are appropriate in this case:

| Name | Role | Hourly Rate |
|---|---|---|
| Mr. D'Antuono | Attorney | $275 |
| Mr. Turner | Attorney | $250 |
| Mr. Miller | Attorney | $250 |
| Ms. Jackson | Legal Assistant | $90 |

| Ms. Carver | Legal Assistant | $100 |
|------------|-----------------|------|

*See Praseuth v. Rubbermaid, Inc.*, 406 F.3d 1245, 1259 (10th Cir. 2005) (the Court may

rely on its knowledge of rates for lawyers with comparable skill and experience practicing

in the subject District); *see also Hitchens v. Thompson Nat'l Props, LLC*, No. 12-cv-02367-

LTB-BNB, 2014 WL 2218094, at *2-3 (D. Colo. May 29, 2014) (collecting cases discussing

hourly rates for attorney and paralegals in the Denver legal market).

##### 2.    Number of Hours

In determining the reasonableness of the hours expended, the Court considers

several factors.  First, I consider whether the fees pertain to tasks that would ordinally be

billed to a client. *See Ramos v. Lamm*, 713 F.2d 546, 554 (10th Cir. 1983), *overruled on*

*other grounds by Penn. v. Del. Valley Citizens' Council for Clean Air*, 483 U.S. 711, 717 n.4

(1987).  It is Movants' burden "to prove and establish the reasonableness of each dollar,

each hour, above zero." *Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1210 (10th Cir.

1986) (quotations omitted). "The Supreme Court, recognizing that not all hours expended

in litigation are normally billed to a client, noted that an applicant should exercise 'billing

judgment' with respect to a claim of the number of hours worked." *Malloy*, 73 F.3d at 1018.

Hence, the court has a "corresponding obligation to exclude hours 'not reasonably

expended' from the calculation." *Malloy*, 73 F.3d at 1018.  A court should take extra care

to ensure that an attorney has not included unjustified charges in his billing statement.

*Praseuth*, 406 F.3d at 1257.  A court should also consider whether the amount of time

spent on a particular task appears reasonable in light of the complexity of the case, the

strategies pursued, and the responses necessitated by an opponent's maneuvering. *Id.*

Ultimately, the Court's goal is to fix a fee that would be equivalent to what the attorney would reasonably bill for those same services in an open market and fees will be denied for excessive, redundant, and otherwise unnecessary expenses. *Ramos*, 713 F.2d at 553.

In reaching a determination the Court "need not, and indeed should not, become green-eyeshade accountants. The essential goal . . .  is to do rough justice, not to achieve auditing perfection. So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." *Fox v. Vice*, --- U.S. ---, 131 S.Ct. 2205, 2217 (2011); *Malloy*, 73 F.3d at 1018 ("the district court need not identify and justify every hour allowed or disallowed, as doing so would run counter to the Supreme Court's warning that a request for attorney's fees should not result in a second major litigation") (quotation marks and citation omitted).  Here, after a thorough review of the briefs, the billing records, the affidavits, and the pleadings filed in this case, I conclude that Movants have met their burden of showing that the total hours listed below, which are reflected in the Billing Statement and Mr. Aisenberg's Opinion, were reasonably expended in ths litigation.

| Name | Role | Hours | Billing Statement Reference |
|------|------|-------|----------------------------|
| Mr. D'Antuono | Attorney | 73.85 | pp. 26-40 |
| Mr. Turner | Attorney | 19.9 | pp. 21-25 |
| Mr. Miller | Attorney | 3.3 | pp. 19-20 |
| Ms. Jackson | Legal Assistant | 4.3 | p. 41 |
| Ms. Carver | Legal Assistant | 3.65 | p. 18 |

The Court notes that the Billing Statement reflects 14.95 hours of work performed by Mr. D'Antuono that post-dates Wilds' termination of Movants, which is included in Mr.

19

D'Antuono's total hours in the chart above.  Here, in support of the costs incurred after

December 4, 2012, Movants offer testimonial support for the necessity of those costs as

follows.

> Acting upon the hostile email by Susan Wilds of December 4, 2012, by which
> she discharged her attorneys, the undersigned attorneys [sic] undertook a
> course of action over the next month with the specific ethical guidance of
> former Chief United States Magistrate Judge Donald Abram.  Said guidance
> was specifically sought concerning motions to be filed with this Court in order
> to preserve the informal offer of policy limits plus interest by Guardian Life
> through its attorneys, secure extensions of time with respect to outstanding
> discovery directed to Defendant and Counterclaimant Susan Wilds so as to
> avoid discovery sanctions/dismissal of the case and in order to secure the
> interest of the undersigned former attorneys [sic] for Susan Wilds as a real
> party in interest in this matter.  A petition filed by the undersigned attorney
> included a motion to extend discovery deadlines in the case so as to avoid
> disastrous negative consequences, an appropriate Motion to Withdraw with
> notice to Susan Wilds, and a motion to establish an attorneys' lien in
> accordance with applicable law.

> During the month of January 2013, this case became more problematic.  As
> evidenced by the emails of January 2013, Guardian Life responded to Susan
> Wilds' written discovery requests.  With respect to the written discovery
> requests served by Plaintiff Guardian Life,  including significant requests for
> admissions, and despite communications from her former undersigned
> attorneys [sic] that she must comply with providing discovery responses,
> Susan Wilds never responded and was entirely uncommunicative and absent
> regarding such issues. Her former attorneys had, for obvious reasons,
> drafted answers to interrogatories, responses to requests for production of
> documents, and responses to requests for admissions for appropriate
> signature by Susan Wilds with an eye toward avoiding case dismissal.  At the
> specific urging of Judge Abram, the undersigned attorney communicated with
> Susan Wilds' daughter in an attempt to achieve communication through an
> intermediary such that Susan Wilds would file required discovery responses.
> Further, the undersigned former counsel for Susan Wilds, who perceived that
> he had developed a good faith basis for informal communication with
> attorneys for Guardian [ ] Life did on multiple occasions remonstrate with
> Guardian Life's attorneys so that Guardian Life would essentially "keep open"
> its offer and [ ] not take action to seek serious sanctions for Susan Wilds[']
> failure to answer written discovery, including requests for admissions.

*D.Antuono Aff.* [#56-2] ¶¶ 9-10.  The Court finds that this explanation justifies the post-

December 4, 2012 fees sought by Movants.  Further, recovery of fees for resolving an attorney's fee request is normally allowed even after the merits of the dispute have been settled. *Hernandez v. George*, 793 F.2d 264, 269 (10th Cir. 1986). "It is obviously fair to grant a fee for time spent litigating the fee issue, at least if the fee petitioner is successful and his claim as to a reasonable fee is vindicated, since it is the adversary who made the additional work necessary." *Glass v. Pfeffer*, 849 F.2d 1261, 1266 n.3 (10th Cir. 1988) (quoting *Prandini v. Nat'l Tea Co.*, 585 F.2d 47, 54 n.8 (3d Cir. 1978)).

     **3.**    **Lodestar Amount**

Based on the aforementioned conclusions, the Court finds that the lodestar figure for Movant's attorneys' fee request is $26,860.75.

| Name | Hours | Hourly Rate | Total |
|---|---|---|---|
| Mr. D'Antuono | 73.85 | $275 | $20,308.75 |
| Mr. Turner | 19.9 | $250 | $4,975.00 |
| Mr. Miller | 3.3 | $250 | $825.00 |
| Ms. Jackson | 4.3 | $90 | $387.00 |
| Ms. Carver | 3.65 | $100 | $365.00 |
|  |  |  | $26,860.75 |

Mr. Aisenberg states that the Survey "states that there is a yearly inflation factor of 3%" and therefore, he adds the inflation factor into his total. *Aisenberg Opinion* [#56-5] at 8.  The Court has reviewed the document titled Colorado Bar Association 2008 Economic Survey, which appears to be the Survey relied on by Mr. Aisenberg.  Available at: http://www.cobar.org/repository/LPM%20Dept/2008EconSurvey.pdf (last visited July 21, 2014).  Based on the Court's review of the Survey, it does not require adjustment for

inflation.  With regard to Exhibit 10 in the Survey, it states that the 1999-2007 data was not

adjusted for inflation and "[i]f these changes were adjusted for inflation (about 3% per year),

*real* income has remained essentially steady throughout this time period." *Id.* at 10.

Further, the Court's determination of what the reasonable hourly rates are for each of the

attorneys and support staff is based on their experience as of 2014, not their experience

as of 2008.  Therefore, the Court will not adjust the total billable amount by adding any

amount for inflation as suggested by Mr. Aisenberg.

###### 4.     Multiplier

Mr. Aisenberg also opines that the Court should apply a 2.57 multiplier in this case.

*Aisenberg Opinion* [#56-5] at 9.  He suggests that because this is a contingent fee case,

a 2.57 multiplier is appropriate and will result in payment of attorneys' fees that are

"significantly less than called for in the contingent fee agreement."  *Id.*

In some circumstances, the Court will apply a multiplier in contingent fee cases "to

compensate for the risk of recovering nothing for [the attorneys'] work."  *Tuten v. United

Airlines, Inc.*, No. 12-cv-01561-WJM-MEH,  --- F.Supp.2d ---, 2014 WL 2057769, at *4 (D.

Colo. May 19, 2014) (awarding attorneys' fees in class action and stating that "a lodestar

multiplier at or below 2 . . . is reasonable compared with other cases of similar size and

result."); *Ashley v. Regional Transp. Dist. & Amalgamated Transit Union Div. 1001 Pension

Fund Trust*, 2008 WL 384579, at *8 (D. Colo. Feb. 11, 2008) ("The lodestar figure may be

adjusted to suit the particular circumstances of the case, especially where the degree of

success achieved is exceptional.") (citing *Roe v. Cheyenne Mt. Conf. Resort*, 124 F.3d

1233 n.8 (10th Cir. 1997)); *compare Ryskamp v. Looney*, No. 10-cv-00842-WJM-KLM,

2012 WL 3397362, at *5 (D. Colo. Aug. 14, 2012) (applying 0.77 multiplier in derivative

litigation that settled prior to resolution of dispositive motions); *Lucken Family Ltd. P'ship, LLLP v. Ultra Res., Inc.*, No. 09-cv-01543-REB-KMT, 2010 WL 5387559, at *3 (D. Colo. Dec. 22, 2010) (applying 1.82 multiplier in class action litigation that settled and stating that the multiplier "is lower than lodestar multipliers that federal courts consistently have approved in other class action cases."). The Court may also consider the factors enumerated in *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974),[8] and increase fees "based on risk of non-recovery, excellent or exceptional results, or delay in receipt of payment." *Grant v. George Schumann Tire & Battery Co.*, 908 F.2d 874, 880 (11th Cir. 1990) (citation omitted); *Miniscribe Corp. v. Harris Trust Co.*, 309 F.3d 1234, 1243 (10th Cir. 2002) (applying *Johnson* factors in determining fees for bankruptcy trustee and affirming fee award based on lodestar multiplier of 2.57 in class action); *Norman v. Housing Auth. of City of Montgomery*, 836 F.2d 1292, 1302 (11th Cir. 2988) (noting that fees may be enhanced in contingent fee cases "only where it is shown that such enhancement is necessary to assure the availability of counsel" and that "where there is a delay [in payment] the court should take into account the time value of money and the

---

[8] The twelve *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. "[R]arely are all of the *Johnson* factors applicable." *Uselton v. Commercial Loveloace Motor Freight, Inc.*, 9 F.3d at 849, 854 (10th Cir. 1993). More recent Tenth Circuit and Supreme Court precedent in fee-shifting cases casts doubt on the continuing relevance of the *Johnson* factors in fee-shifting cases. *See Anchondo v. Anderson, Crenshaw & Assocs.*, 616 F.3d 1098, 1103 (10th Cir.2010) ("In *Perdue* the Court appears to significantly marginalize the twelve-factor *Johnson* analysis") (citing *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 553 (2010)). Here, because this is an action in which Movants seek to enforce an attorney lien, *Anchondo* and *Perdue* are inapposite.

effects of inflation and generally award compensation at current rates rather than historic rates."). The Supreme Court has noted that in statutory fee-shifting cases, "an enhancement may not be awarded based on a factor that is subsumed in the lodestar calculation." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 553 (2010) (discussing fee shifting pursuant to 42 U.S.C. § 1988) (citations omitted). While this case is not a statutory fee-shifting case, the same logic applies because the billable rates should take into account the attorneys' levels of skill and the hours worked should reflect the complexity of the case. Therefore, "the novelty and complexity of a case generally may not be used as a ground for an enhancement . . . ." *Id.* (citation omitted). Similarly, "the quality of an attorney's performance generally should not be used to adjust the loadstar" because it is reflected in the reasonable hourly rate. *Id.* (citation omitted).

Further, "the burden of proving that an enhancement is necessary must be borne by the fee applicant" and the "fee applicant seeking an enhancement must produce 'specific evidence' that supports the award." *Id.* (citations omitted). Here, Movants argue for the application of a 2.57 multiplier because the case was taken on contingency and "the attorney or attorneys involved take the risk that there will be no recovery . . . ." *Aisenberg Opinion* [#56-5] at 9. Further, according to Movant's expert, "[t]he results obtained, i.e. Guardian paying the entire face amount of the policy plus interests into the Registry of the Court represents the best possible result that could be obtained under the declaratory judgment action." *Id.*

Here, the Court finds that a multiplier should be applied to compensate Movants for the risk involved in taking this case on contingency. Further, interest will be awarded for the delay in recovery of their fees and costs. *Norman*, 836 F.2d at 1302 ("[W]here there

24

is a delay [in payment] the court should take into account the time value of money and the effects of inflation and generally award compensation at current rates rather than historic rates."). Based on the circumstances in this action, the Court will apply a 1.5 multiplier, because counsel shouldered the risk when they took this case on contingency, and interest at the rate set by 28 U.S.C. § 1961 from the date Plaintiff's Motion For Interpleader [#26] was filed, because that is the date the parties would have settled the case if there was no dispute about Movants' compensation, through the date of payment to Movants. *See Perdue*, 559 U.S. at 555 ("the amount of the enhancement must be calculated using a method that is reasonable, objective, and capable of being reviewed on appeal, such as by applying a standard rate of interest to the qualifying outlays of expenses."); *Norman*, 836 F.2d at 1302 ("where there is a delay [in payment] the court should take into account the time value of money and the effects of inflation and generally award compensation at current rates rather than historic rates.").

### 5.    Costs

As noted above, Movants seek costs advanced in this case pursuant to the terms of the Agreement. According to the Billing Statement, $6,792.50 of the costs sought relates to Mr. Aisenberg's services and the remaining $3,076.69 relates to other costs incurred by Movants such as expert fees for Mr. Laugeson, Judge Abram's fees for a meeting regarding "continued ethical guidance," postage, and copying costs. *Billing Statement* [#63] at 2, 3, 17.

The Agreement discusses potential expenses the attorneys may incur and estimates potential expenses to be in the range of $5,000.00 to $15,000.00 for a claim settled prior to trial. *Agreement* [#56-1] at 2. Wild specifically authorized her counsel to incur

reasonable expenses on her behalf and was informed that "[a]ny reasonable expenses incurred by the Attorneys shall be deducted directly from the net amount remaining from any sum collected by the Client after deduction of the Attorneys's fees." *Id.*  However, Wilds' counsel agreed to obtain Wilds' authority for expenses in excess of $5,000.00.  *Id.*

The $6,792.50 Movants seek for Mr. Aisenberg's services related to work performed by Mr. Aisenberg from September 28, 2013 through November 12, 2013. *Billing Statement* [#63] at 3.  While there is an hourly breakdown for the services Mr. Aisenberg provided, Mr. Aisenberg provided one invoice, dated November 14, 2013, for the total amount due to Movants.  *Id.*  Movants have provided no evidence that they sought and obtained Wilds' approval before incurring this expense that exceeds the $5,000.00 discussed in the Agreement.  However, the work performed by Mr. Aisenberg was necessary for Movants to file the instant Motion and to meet the requirements imposed on an attorney who seeks to enforce an attorney lien.  *See Blum*, 465 U.S. at 895 n.11 (stating that an attorney must produce "satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.").  In addition, recovery of fees for resolving an attorney's fee request is normally allowed even after the merits of the dispute have been settled. *Hernandez*, 793 F.2d at 269. "It is obviously fair to grant a fee for time spent litigating the fee issue, at least if the fee petitioner is successful and his claim as to a reasonable fee is vindicated, since it is the adversary who made the additional work necessary." *Glass v. Pfeffer*, 849 F.2d 1261, 1266 n.3 (10th Cir. 1988) (quoting *Prandini v. Nat'l Tea Co.*, 585 F.2d 47, 54 n.8 (3d Cir. 1978)).  Accordingly, the Court will award Movants' request for $6,792.50 in costs relating to Mr. Aisenberg's professional

26

services

The remaining $3,076.69 of costs sought by Movants consists of copying costs, postage/delivery fees, and costs relating to Richard W. Laugeson's work as an expert. *Billing Statement* [#63] at 17. $1,597.08 relates to costs incurred on or before December 4, 2012.  There costs appear reasonable on their face and, under the Agreement, Movants are entitled to recover these amounts.  Movants also seek: (1) $297.77 advanced to expert Richard Laugesen[9] on January 9, 2013; (2) January 28, 2013 postage fees totaling $1.84; and (3) $1,180.00 for a four hour meeting with Judge Abram on March 13, 2014 regarding "ethical guidance . . . post discharge as attorneys." *Id.*

Notably, "the charging lien extends only to attorney fees for those professional services rendered in obtaining the judgment and not for unrelated services." *In re Estate of Benney*, 790 P.2d 319, 323 (Colo. 1990).  In addition, Movants bear the burden of demonstrating the validity of their lien. *Deitz v. Univ. of Denver*, Nos. 95-cv-02756-WDM-OES, 97-cv-00897-WDM-OES, 2011 WL 723118, at *8 (Feb. 22, 2011) ("it is the claimant who bears the burden of proof); *Bd. of Cnty Comm'rs of Jefferson Cnty v. Quaintance*, 183 P.2d 569, 571 (1947) (citation omitted); *In re Marriage of Mitchell*, 55 P.3d 183, 185 (Colo. App. 2002) ("the burden if proof is upon the attorney who claims a lien for services to show that he or she comes within the statute").  Here, in support of the costs incurred after December 4, 2012, Movants offer testimonial support for the necessity of those costs as summarized above in Section II.C.2.  In sum, Movants continued to perform limited work in order to ensure that Guardian did not revoke its offer to pay the full value of the life

---

[9] "Mr. Laugesen was retained early on as an expert and that fact was disclosed to opposing counsel, albeit informally." *Turner Aff.* [#56-3] ¶ 20.

insurance policy and to minimize the chance that Wilds' failure to respond to discovery requests would lead to sanctions. *D.Antuono Aff.* [#56-2] ¶¶ 9-10. The Court finds that this explanation justifies the post-December 4, 2012 costs sought by Movants. Accordingly, Movants are entitled to the $3,076.69 sought for costs that do not relate to Mr. Aisenberg's services.

In total the Court therefore recommends that Movants be granted an attorneys' lien in the amount of $50,160.32, plus interest at the rate set by 28 U.S.C. § 1961, accruing from January 28, 2013. This total consists of fees totaling $26,860.75 multiplied by 1.5, plus $9,869.19 in costs.

### III. Conclusion

Accordingly, for the reasons stated above, the Court respectfully **RECOMMENDS** that the Motion [#56] be **GRANTED in part** to the extent that Movants be awarded $50,160.32, plus interest at the rate set by 28 U.S.C. § 1961, accruing from January 28, 2013.

IT IS FURTHER **RECOMMENDED** that the $336,634.93 in the Court's Registry be distributed as follows: $50,160.32, plus interest at the rate set by 28 U.S.C. § 1961, accruing from January 28, 2013, to Movants and the remaining amount to Wilds.[10]

IT IS FURTHER **ORDERED** that pursuant to Fed. R. Civ. P. 72, the parties shall have fourteen (14) days after service of this Recommendation to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. A party's failure to serve and file specific, written objections waives de novo

---

[10] Wilds' counterclaims asserted against Guardian are the only remaining claims in this action. *See Answer and Counterclaims of Defendant Susan Wilds* [#13] at 6-9.

review of the Recommendation by the District Judge, Fed. R. Civ. P. 72(b); *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996).   A party's objections to this Recommendation must be both timely and specific to preserve an issue for de novo review by the District Court or for appellate review. *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated:  August 12, 2014

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge